## SECOND MODIFICATION AND AMENDMENT TO
## VENUE LEASE AGREEMENT

Reference is hereby made to a certain Venue Lease Agreement between TRICKLE PRODUCTIONS, LLC ("Landlord") and APEX EVENT MANAGEMENT, LLC ("Tenant"), as amended (the "Venue Lease Agreement"). In consideration of the mutual promises contained herein and other good and valuable consideration, and effective as of the date of the last signature below (the "Second Amendment Effective Date"), the following shall constitute the parties' second amendment and modification to the Venue Lease Agreement (the "Second Amendment"):

1. As used herein, all terms shall have the same meaning as when used in the Venue Lease Agreement.

2. The Parties agree that Tenant has timely exercised its option to extend the Term for the Option Period beginning for the 2021 Event.

3. Tenant shall pay Landlord eighty thousand dollars ($80,000.00) no later than five (5) business days following the Second Amendment Effective Date, such amount to be considered an advance against the Rent for the 2021 Event (the "2021 Rent Advance") or, in the event that the 2021 Event does not occur, for the 2022 Event in which case such amount will become the "2022 Rent Advance".

4.

    4.1 Tenant shall pay Landlord a Site lease subsidy in the following amounts (the "Site Lease Subsidy"):

        (a) ten thousand dollars ($10,000.00) for each year beginning in 2021 and ending in 2028; and

        (b) in the event that Landlord leases the property known as "Marathon's Woods" for use for the Event, an additional amount of eleven thousand, one hundred dollars ($11,100.00) for each year 2021, 2022 and 2023.

    4.2 For 2021, Tenant shall pay the Site Lease Subsidy no later than five (5) business days following the Second Amendment Effective Date. For each year following 2021, Tenant shall pay the Site Lease Subsidy promptly following the initial on-sale date of the Event to be held in such year, provided that payment will be paid no earlier than the fifth (5th) of January preceding the Event for such year and no later than the fifth (5th) of April preceding the Event for such year.

    4.3 Landlord's leases regarding Marathon's Woods and the property known as "Boyer's" are subject to Tenant's approval to confirm that they are adequate for Tenant's needs for the Event. To this end, Landlord shall consult with Tenant prior to entering into such leases.

5. Intentionally deleted.

6. Section 2 of the Venue Lease Agreement is deleted and replaced with the following:

    "2. Compensation:

        2.1 In consideration of the Site and this Venue Lease Agreement, and without limiting the other consideration given to Landlord by Tenant under this Venue Lease Agreement,

which consideration is hereby acknowledged as being of value and sufficient consideration to Landlord for the rights granted to Tenant hereunder, the Tenant agrees to pay to Landlord the amounts set forth below in this Section 2 (collectively, "Rent"). The parties agree that the Rent is inclusive of all taxes, fees, assessments, insurance costs, maintenance costs, and other operating costs and expenses of Landlord, excluding only any reimbursable expense expressly set forth elsewhere in this Venue Lease Agreement. As Rent the Tenant shall pay the following amounts to Landlord: (i) nine dollars ($9.00) for each Full Price Ticket per person up to thirty-five thousand (35,000); (ii) five dollars ($5.00) for each Full Price Ticket per person between thirty-five thousand and one (35,001) and forty thousand (40,000); and (iii) three dollars ($3.00) for each Full Price Ticket per person over forty thousand (40,000). As used in this Venue Lease Agreement, the term "Full Price Ticket" means, with respect to any Event, any full price, non-discounted ticket sold to the public and not refunded, for which Tenant has actually been paid. Without limitation, Full Price Ticket does not include: (i) complimentary tickets and/or access provided by Tenant to any third party; (ii) tickets sold on a so-called "payment plan" unless and until one hundred percent (100%) of the full price is actually paid and received by Tenant; (iii) tickets for which Tenant's ticket seller(s) has not actually paid Tenant; and (iv) purchases in addition to a ticket for admission such as early admission and/or camping.

2.2 Except for the 2021 Event, the Rent payable based on tickets and attendance above shall be paid on the following schedule:

(i) twenty-five percent (25%) of the Rent no later than the fifteenth (15th) day of April prior to each Event, with the amount determined with respect to ticket sales as of the prior March 15;

(ii) twenty-five percent (25%) of the Rent no later than thirty (30) days prior to each Event, with the amount determined with respect to ticket sales as of sixty (60) days prior to each Event; and

(iii) the remainder of the Rent no later than thirty (30) days after each Event.

2.3 For the 2021 Event, the Rent payable based on tickets and attendance above shall be paid on the following schedule:

(i) fifty percent (50%) of the Rent no later than the first date of construction/set-up currently expected to be September 1, 2021, with the amount determined with respect to ticket sales as of as of August 1, 2021; and

(ii) the remainder of the Rent no later than thirty (30) days after the Event.

2.4 The Parties intend that a fee will be charged for admission to the event. The fee will be set by Tenant.

2.5 Notwithstanding anything to the contrary contained elsewhere in this Agreement, no Rent will be due for 2020. Tickets previously sold for the 2020 Event and applied to the 2021 Event will be considered tickets sold for the 2021 Event, and will be used to calculate Rent for 2021. The 2021 Rent Advance will be subtracted from the final payment for the Rent for the 2021 Event.

2.6 Tenant may cancel the 2021 Event at any time and for any reason. In the event that the 2021 Event is cancelled, then notwithstanding anything to the contrary contained

elsewhere in this Agreement, no Rent will be due for 2021. Tickets previously sold for the 2021 Event and applied to the 2022 Event will be considered tickets sold for the 2022 Event, and will be used to calculate Rent for 2022. The 2022 Rent Advance will be subtracted from the final payment for the Rent for the 2022 Event."

7. Section 3.4 of the Venue Lease Agreement is deleted and replaced with the following:

"3.4 Notwithstanding anything to the contrary contained above, if, at least thirty (30) days before the end of the then-existing Option Period, Tenant has neither exercised its option to extend the Term for another Option Period nor notified Landlord that Tenant does not wish to exercise such option, then: (i) Landlord shall immediately notify Tenant that its option has not yet been exercised (the "Option Warning"); (ii) Tenant shall be entitled to exercise its option at any time before receiving the Option Warning or within fifteen (15) business days thereafter; and (iii) the then-current Option Period shall be deemed to have continued until Tenant exercises its option or until the end of such fifteen (15) business day period (whichever shall occur first)."

8. The following is added to Section 3:

"3.5 In the event that Landlord obtains the rights to the Site extending past 2028, Landlord shall provide to Tenant the right to obtain options for the Site on the same material terms are contained in this Venue Lease Agreement."

9. Section 4.1 of the Venue Lease Agreement is deleted and replaced with the following:

"4.1 Landlord shall deliver the Site in the condition reasonably required by Tenant for production of the Events. Without limiting the generality of the foregoing, with respect to the Site, Landlord shall provide the following on an ongoing basis:

(a) seeded, cared for and continuously mowed grass fields;

(b) trash removal including but not limited to bordering brush, trees, campgrounds, main venue lobbies;

(c) intentionally deleted; and

(d) maintained roads including repair for wash outs, removal of rocks and repaired potholes and the like.

The existing condition will be jointly documented and a scope of work for repair or replacement of damages and/or an abatement of the Rent for Landlord's failure to deliver will be jointly agreed upon during a pre-Event walk through with representatives from Landlord and Tenant."

10. Section 4.2 of the Venue Lease Agreement is deleted and replaced with the following:

"4.2 During the Term, Tenant shall only be responsible, at its sole cost and expense, for repairing any damage to the Site caused by the actions of Tenant and/or its guests, employees, agents, and contractors including, without limitation, attendees of any Event. To limit damages, Tenant shall create a map for pathways for use of golf carts and 4x4s, provide the same to all drivers, and use Tenant's best efforts to enforce the requirement for drivers to remain on designated pathways at all times. Damages will be jointly documented and a scope of work for repair or replacement of damages will be jointly agreed upon during a post-Event walk through

with representatives from Landlord and Tenant on the following schedule: (i) a preliminary walk through to occur three (3) to five (5) days after each Event; and (ii) a final walk through to occur on the final day of tear down for each Event. Nothing in this Agreement shall make Tenant in any way responsible or liable for any conditions with respect to the Site (including hazardous substance conditions) which (i) exist prior to the Effective Date, or (ii) occur during the Term due to the acts or omissions of anyone other than Tenant and its guests, employees, agents, and contractors, including the attendees of any Event.

11. Section 5 of the Venue Lease Agreement is deleted and replaced with the following:

"5. Alterations; Improvements:

On or before the 2021 Event, Landlord shall provide the following improvements to the Site at Landlord's sole expense but in consultation with Tenant:

(a) permanent trench lines to reduce and/or eliminate the need for above-ground cable covers and/or so-called "yellow jackets", in reasonable locations to be designated by Tenant on a map or other in-person explanation provided that areas including grass are not expected to be included for 2021;

(b) each well must be pre-tested and approved for usage no later than the Set-Up date for each Event;

(c) intentionally deleted;

(d) assist Company in cleaning forested area, including so-called "Wookie Woods", adding a pathway from parking lot to Stage 3 including, without limitation, leveling ground and tree clean-up, in reasonable locations to be designated by Tenant on a map or other in-person explanation;

(e) fences and/or other crowd barriers surrounding Tenant's property on the Site including, without limitation, the large brachiosaurus near the main stage and the entrance to the so-called "wooky woods"; and

Moreover, Landlord shall make reasonable good faith efforts to reclassify the backstage area as campgrounds."

12. Section 7 of the Venue Lease Agreement is amended by adding the following:

"7.3 Landlord shall provide Tenant with reasonable assistance in securing all permits and/or licenses that are necessary for the Events including, without limitation, food, sanitation or liquor licenses, structure/tent/building, transportation and/or work permits."

13. Section 13 of the Venue Lease Agreement is deleted and replaced with the following:

"Force Majeure Event. The failure of any party to comply with its obligations hereunder shall be excused to the extent such party's performance has been rendered impossible and/or impracticable as a result of illness or death of an artist or other artist unavailability, an act of God, strike, labor dispute, war, fire, earthquake, act of public enemies, acts of terrorism, action of federal, state or local governmental authorities, disease, epidemic, pandemic and/or other public health emergency (including the continued effects thereof, which may include, for example, the lack of available medical supplies), or for any other reason beyond the reasonable control of the

EXHIBIT G-4

party claiming protection by reason of such force majeure event (a "Force Majeure Event"). In the event that the Event or any portion thereof is cancelled by reason of a Force Majeure Event, Tenant may terminate this Agreement immediately as to that Event or such portion thereof and shall have no further obligations to Landlord hereunder as it relates to that Event or such portion thereof, provided that all Rent already paid by Tenant to Landlord shall be returned to Tenant."

14. Except as provided herein, all terms and conditions provided in the Venue Lease Agreement shall remain applicable as originally provided therein. This document may be executed in counterparts, which taken as a whole shall constitute a complete, original document, as shall the execution of a so-called "PDF" by the parties hereto.

15. As modified and amended, the Venue Lease Agreement, as amended, is hereby ratified, affirmed and acknowledged to be in full force and effect.

WITNESS THE EXECUTION HEREOF effective the day and year first below written.

Trickle Productions, LLC                    APEX EVENT MANAGEMENT, LLC,

_____               _____
[Signature]                                 [Signature]

By: _Trickle Productions LLC Steve Trickle_ By: _Jeff Abel_
    [Printed Name]                              [Printed Name]

Its: _Pres_                                 Its: _President_
     [Title]                                     [Title]

Date: _4-1-2021_                            Date: _4-5-2021_

EXHIBIT G-5