## AGREEMENT FOR SERVICES

**THIS AGREEMENT FOR SERVICES** (this "Agreement for Services") is made effective as of the later of the dates set forth below the signatures below (the "Effective Date") by and between **LNKBOX Group, Inc.** ("Vendor"), a California C Corporation with offices at 600 S. Spring St. Unit 608, Los Angeles, CA 90014, and **Apex Event Management, LLC** ("Company"), a Delaware limited liability company with offices at 15821 Ventura Blvd., Suite #370, Encino, CA 91436 (collectively, the "Parties") in connection with services to be provided by Vendor at the **Lost Lands Music Festival** (the "Event"), currently scheduled to be held on **September 24 – 26, 2021** at **Legend Valley in Thornville, Ohio** (the "Venue"). The attached Terms & Conditions (the "Terms & Conditions") are expressly incorporated herein by reference. Unless the context requires otherwise, all references to the "Agreement" means the Agreement for Services, the Terms & Conditions and all exhibits, if any, expressly attached hereto and incorporated by reference.

## SERVICES

Vendor shall provide Company the following services ("Services"):

To provide Seventy (70) decorated carts and drivers for patron transportation, as well as providing Two (2) ADA carts and One (1) UTV for ADA program and Two (2) Jurassic Glamping Shuttles., as outlined below, as well as necessary equipment and **Eighty (80) Staff** required to provide Seventy (70) decorated carts and drivers for patron transportation, as well as providing Two (2) ADA carts and One (1) UTV for ADA program and Two (2) Jurassic Glamping Shuttles.

On Site Start Date (First Work Date): 09/20/21
On Site End Date (Last Work Date): 09/27/21

☐ *Please check box:* PERSONAL PHOTOGRAPHER/VIDEOGRAPHER EXCLUSION:

Vendor acknowledges that it cannot bring a video or photo team into the Event without prior written approval by Company, and if such permission is granted, then Vendor agrees to execute a personal photographer videographer authorization agreement prior to the Event.
*Vendor hereby acknowledges that total Compensation set forth below is inclusive of all gear and transportation required to provide services outlined herein.*

Company may, at any time, by written notice to Vendor, make changes to the Services within the general scope of this Agreement by revising the description of Services set forth herein. Should any such change increase or decrease the Compensation due to Vendor, adjustments may be made pursuant to the mutual approval of the Parties. Within ten (10) calendar days of the completion of Services, Vendor shall provide to Company a final invoice detailing the total Services provided to Company as well as the **total amount** of Compensation due to Vendor, less any payments previously applied (hereinafter referred to as the, "Final Invoice").

## COMPENSATION

In accordance with Section 3 of the Terms & Conditions, Company shall receive compensation as follows (the "Compensation"):

Compensation is contingent upon total Services provided by Vendor. As of the date of this Agreement the total Compensation due to Company is **TWENTY TWO THOUSAND SEVEN HUNDRED FIFTY DOLLARS AND ZERO CENTS ($22,750)** (amount is inclusive of any and all taxes, fees and dues affiliated with Services).

Vendor to pay festival a total of $22,750.00
- Seventy (70) golf carts @ $275 per unit - $19,250
- 10 FlexTrams at $350 per unit - $3,500
- Sourcing (2) ADA carts and (1) Polaris for LL to provide transpo to ADA program LL to provide drivers) & (2) 6pass for Jurassic Glamping Shuttles (vendor to provide drivers at hourly rate of $95 per hour). All (5) units to be billed back to festival based on actuals. LL can choose to allocate vendor drivers and golf carts from main fleet for private or dedicated transportation, tours, etc., to be billed at an hourly rate of $95 per hour.

Total Compensation (the amount is inclusive of any and all taxes, fees and dues affiliated with Services) is contingent upon actual Personnel & Equipment hours worked and services provided. Under no circumstances shall Vendor be entitled to receive any compensation for any hours worked or any services not outlined herein or otherwise requested by Company without the prior written consent of Company. Should any such change increase or decrease the Compensation due to Vendor, proper adjustments shall be made to the Compensation.

Compensation shall not exceed what is outlined herein without prior written consent from Company.

| PAYMENT TERMS | WIRING INSTRUCTIONS & DESIGNATED VENDOR BANK ACCOUNT |
|---|---|
| All sums due to Company under this Agreement shall be paid by Vendor to Company, less all deductions permitted to be taken under this Agreement, within thirty (30) days following the later of either: (a) October 31, 2021; (b) the Effective Date; (c) receipt by Vendor of Company's proof of insurance; (d) receipt by Vendor of verifiable and accepted Final Invoice as referenced herein; or (e) receipt by Vendor of Company's W-9.<br><br>Fifty Percent (50%) of the Compensation is payable no later than the later of either: (a) thirty (30) days prior to the Event; (b) the Effective Date: (c) receipt by Company of Vendor's proof of insurance; (d) receipt by Company of verifiable and accepted invoice for the appropriate amount; or (e) receipt by Company of Vendor's W-9.<br><br>Any remaining Compensation due to Company or Vendor shall be payable, less all deductions permitted to be taken under this Agreement, within thirty (30) days following the later of either: (a) October 31, 2021; or (b) receipt by Company of verifiable and accepted Final Invoice. | |

**COMPANY PROVIDES**

**\*\*All dates must be pre-approved by Company in writing\*\***
**\*\*\*Final approved on-site resources will be communicated prior to the Event\*\*\***

Company shall provide Vendor the following based on actual onsite dates. Reimbursements as listed below.
*Reimbursements not included in Total Compensation. Itemized receipts(s) required for any and all reimbursements.*

- Working credentials for Eighty (80) Vendor personnel. Exact dates and credential type per advance.
- Parking passes for Forty (40) vehicles. Exact dates and parking lot location per advance.
- Camping credentials for up to Eighty (80) Vendor personnel. Exact dates and campground location per advance.

Additional on-site resources, i.e. radios, golf carts, tables/chairs, power, etc. will be determined by Company and communicated to Company prior to the Event.

*Remainder of page is intentionally left blank; signatures appear on next page.*

AEG 000082

*BY SIGNING BELOW, THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ AND AGREE TO BE BOUND BY THE ATTACHED TERMS & CONDITIONS, WHICH ARE FULLY INCORPORATED HEREIN BY REFERENCE. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS & CONDITIONS AND THE AGREEMENT FOR SERVICES AND/OR ANY OTHER CONTRACT, PROPOSAL, INVOICE, BILL, RIDER, ETC., THE ATTACHED TERMS & CONDITIONS SHALL PREVAIL.*

**ACCEPTED AND AGREED:**

| LNKBOX GROUP, INC.: | APEX EVENT MANAGEMENT, LLC: |
|---|---|
| Signature: _____ | Signature: _____ |
| Name: _____ | Name: Brett Abel |
| Title: _____ | Title: Authorized Signatory |
| Date: _____ | Date: _____ |

EXHIBIT H-3

## TERMS & CONDITIONS

These Terms & Conditions (the "Terms & Conditions") supplement and are fully incorporated into the Agreement for Services between Vendor and Company relating to the Event identified in the Agreement for Services. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement for Services.

1. **Scope of Services.** Company hereby engages Vendor, and Vendor hereby agrees, to provide the Services. Without limiting the generality of the foregoing, Vendor shall provide all items necessary to perform the Services including, without limitation, staff, personnel, materials, equipment, supplies, uniforms and communication equipment (the "Materials"). Vendor shall retain ownership of all of the Materials and all risk of loss thereto shall be borne solely by Vendor. Vendor shall be solely responsible for maintenance of the Materials. Vendor shall comply with and conform to all rules, regulations and directives issued by Company or its designees from time to time and shall cause Vendor's employees to comply with and conform to all of the same. If necessary, for Vendor to fulfill its obligations hereunder, Company will give Vendor that number of tickets or passes to the Event determined by Company after consulting with Vendor for Vendor's employees actually working at the Event. Any resale, distribution, transfer or misuse of such Event tickets or passes is strictly prohibited and breach of this provision will be a material breach hereunder. In addition, Vendor shall be charged the value of any tickets or passes transferred in breach of this provision.

2. **Term.** The term of this Agreement shall commence as of the Effective Date hereof and expire on the later of either October 31, 2021, or the date on which all obligations of the parties have been fulfilled ("Term"), unless sooner terminated in accordance with the terms and conditions of this Agreement. Upon the expiration or sooner termination of the Event, Vendor shall promptly remove all of its materials from the Venue. If Vendor fails to so remove any of its Materials, Company, may, at its option, either remove and dispose of any or all of the same at Vendor's expense or retain the same, in which latter event all right, title and interest therein shall pass to and vest in Company

3. **Compensation.**

a. As full and complete compensation for all of the Services to be provided by Vendor pursuant to this Agreement, Vendor shall remit to Company the Compensation. Except as otherwise expressly set forth in the Agreement for Services, all sums due to Company under this Agreement shall be paid by Vendor to Company, less all deductions permitted to be taken under this Agreement, within thirty (30) days following the later of either: (a) October 31, 2021; (b) the Effective Date; (c) receipt by Company by Vendor's proof of insurance; (d) receipt by Company of a verifiable and accepted final invoice detailing the total Services provided to Company as well as the total amount of Compensation due to Vendor, less any payments previously applied; or (e) receipt by Company of Vendor's W-9. To the extent Company has agreed to pay all or any portion of the Compensation via wire transfer of funds to Vendor, it shall do so according to the Wiring Instructions / ACH Authorization Form to the Designated Vendor Bank Account. If Vendor desires to make any change to the Wiring Instructions and/or to the Designated Vendor Bank Account (e.g., change the bank and/or account number for deposit, etc.), Vendor must give notice of such requested change to Company prior to the date that any portion of the Compensation is due from Company. Any request(s) to change to the Wiring Instructions and/or the Designated Vendor Bank Account made by or on behalf of Vendor shall be subject to independent verification by Company and may result in a delay or delays in Company making timely payments to Vendor. Any such delay shall not be deemed a default of any Company payment obligations under this Agreement.

b. The Compensation is inclusive of the Services and all items necessary to perform the services including, without limitation, staff, personnel, materials, equipment, supplies, uniforms and communication equipment, travel, lodging, so-called out-of-pocket expenses and per diems.

4. **Safety and Legal Requirements; Authority.** Without in any way limiting any other term or provision of this Agreement or any obligation of Vendor hereunder, Vendor shall do or cause to be done all of the following: (a) perform the Services in a first-class manner that shall protect the health and safety of Vendor and Company employees, agents and the public generally; (b) comply with all laws, policies, rules, and regulations applicable to the Services; (c) if an authorized management person of Company is not available, then contact the proper local authorities for assistance when such assistance is appropriate for safety; (d) obtain, maintain and comply with all licenses, permits, franchises and approvals from any governmental authority that may be required to enable Vendor to perform all of the Services and fulfill all of its obligations under this Agreement; (e) ensure that Vendor's employees, subcontractors and personnel comply with best practices for its industry; (f) if the Services include erection of any structure at the Event, prior to the commencement of the first presentation of the Event, Vendor shall provide to Company a certificate from a qualified engineer certifying that or to the effect that any structure erected for the purpose of the staging of the Event complies with all relevant regulatory requirements and consents and is otherwise soundly constructed and safe having regard to the purpose for which it was constructed.

5. **Representations and Warranties.** Vendor represents and warrants that: (a) it has the full right and authority to enter into and fully perform this Agreement in accordance with its terms; (b) this Agreement constitutes a valid, binding and enforceable agreement, and the execution, delivery and performance of this Agreement will not violate the provisions of any agreement to which it is a party or by which it is bound; (c) it shall comply with all rules, regulations and directives issued by Company or its designees; and (d) each of its employees, subcontractors, or other representatives who will be operating a motor vehicle, heavy machinery, or similar equipment are duly licensed to do so and have no history of reckless operation, or drug or alcohol convictions.

6. **Equipment Warranty.** Vendor hereby represents, warrants and covenants that: (a) all equipment will be free from defects in workmanship and material and conform in all material respects to all specifications provided by this Agreement, (b) all equipment shall be of high quality material and shall be free of liens or encumbrances except for liens or encumbrances arising in the normal course of business by operation of law that are not at the particular time in question due and delinquent, (c) the equipment shall comply with all laws and regulations applicable to the equipment, and (d) the equipment is fit for its intended purpose.

7. **Vendor's Employees.** Vendor's employees will be well-groomed, courteous, efficient and properly trained and speak English fluently. Vendor shall use its best efforts to not employ any person who uses improper language, who acts in a loud or boisterous manner or who has been designated by Company as *persona non grata*. Vendor's employees shall not consume alcoholic beverages or illicit drugs, or be under the influence of alcohol or illicit drugs, or possess weapons of any type while performing the Services. Vendor shall ensure that Vendor's employees refrain from smoking or using cell phones except during break periods. Vendor shall ensure that its employees comply with Company's guidelines regarding Event access. Company retains the right, solely at Company's discretion, to direct Vendor to remove any of its employees from the Event, and to refuse to permit those individuals to return to work at the Event. Vendor shall ensure that its employees are checked in, properly briefed and deployed no later than the scheduled Services start time. Vendor's employees shall remain at an appropriate duty post (the location of which will be directed by Vendor supervisors and approved by Company) for the duration of each day except during break periods as required by law and approved by Vendor manager. Vendor shall stagger employee break periods to maintain a sufficient number and placement of Vendor's employees to ensure proper service throughout the Event. The number of staff required for each Event will be mutually determined by Company and Vendor, provided that any changes in staff requirements will not change the Compensation unless otherwise expressly agreed by the Parties in writing.

8. **Indemnification.** VENDOR AGREES TO INDEMNIFY, DEFEND AND FOREVER SAVE AND HOLD HARMLESS THE COMPANY, ITS AFFILIATES OR RELATED ENTITIES, ARTIST(S), CO-PROMOTERS (IF ANY), THE VENUE, AND SPONSORS AND THEIR RESPECTIVE PRINCIPALS, SHAREHOLDERS, MEMBERS, PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, TENANTS, AGENTS, CONTRACTORS AND VOLUNTEERS (SOMETIMES COLLECTIVELY REFERRED TO HEREIN AS THE "INDEMNITEES" AND INDIVIDUALLY AS A "INDEMNITEE"), FROM AND AGAINST ANY AND ALL DAMAGES, CLAIMS, LOSSES, DEMANDS, COSTS, EXPENSES (INCLUDING ATTORNEYS, FEES AND COSTS), OBLIGATIONS, LIENS, LIABILITIES, ACTIONS AND CAUSES OF ACTION, THREATENED OR ACTUAL, WHICH ANY ONE OF THE INDEMNITEES MAY SUFFER OR INCUR ARISING DIRECTLY OR INDIRECTLY OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THE SERVICES OR THE FAILURE OF VENDOR OR ITS OFFICERS, DIRECTORS, SHAREHOLDERS, OWNERS, EMPLOYEES, REPRESENTATIVES, AGENTS, CONTRACTORS OR VOLUNTEERS ("REPRESENTATIVES") TO PERFORM THE SERVICES

IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, EXCEPT TO THE EXTENT ARISING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COMPANY. THE FOREGOING INDEMNIFICATION SHALL SURVIVE ANY TERMINATION OR THE EXPIRATION OF THE TERM OF THIS AGREEMENT.

9. **Insurance**.

a. Without in any way limiting or altering the indemnification requirements of Vendor under or pursuant to this Agreement, Vendor shall, at its sole cost and expense, procure and maintain in force with duly licensed insurance carriers the following insurance for the Term: (i) a commercial general liability insurance policy covering bodily injury and property damage liability, personal and advertising injury liability and errors and omissions injury liability, with minimum limits of not less than Two Million Dollars (US$2,000,000) per occurrence and Five Million Dollars (US$5,000,000) in the aggregate, including a waiver of subrogation, (ii) to the extent applicable, worker's compensation insurance coverage adequate to comply with all statutory requirements covering all persons employed by Vendor hereunder and employer's liability with minimum limits of at least One Million Dollars (US$1,000,000), including a waiver of subrogation; and (iii) to the extent applicable as it would pertain to the Services, business auto liability insurance with a limit of not less than One Million Dollars (US$1,000,000) combined single limit providing coverage for all owned, hired and borrowed automobiles.

b. Within five (5) business days of the Effective Date, Vendor shall deliver to Company certificates of insurance evidencing the existence of the insurance required by this Agreement and with an endorsement which shall endorse Apex Event Management, LLC, Lost Lands Festival, Excision, Steve and Laura Trickle, Legend Valley, LLC, Trickle Productions LLC, Madison House Presents, LLC, AEG Presents, LLC and Anschutz Entertainment Group, Inc., and each of their respective parents, affiliates, subsidiaries, officers, directors, representatives, shareholders, members, agents, employees, subcontractors and any other party reasonably designated by Company as an additional insured under the policies in sub-paragraphs (i)-(iii) above. Such certificates shall also provide that such coverage will not be canceled or the subject of a material adverse amendment without at least ten (10) days prior written notice to Company. Upon any cancellation and/or material adverse amendment of any such insurance coverage, and prior to the effective date thereof, Vendor will deliver evidence of replacement insurance to Company.

10. **Waiver by Vendor**. Vendor agrees that Company shall not be responsible for any loss or damage to any property of Vendor resulting from fire, theft or any other cause unless due to the negligence or willful misconduct of Company and, except to the extent expressly provided herein, Vendor expressly assumes all risks of loss, damage or destruction of or to any of its property resulting from any such causes.

11. **Termination**. Without limiting any other provision of this Agreement, this Agreement may be terminated (a) by Company immediately upon notice to Vendor if Vendor fails, refuses or neglects to perform each and every one of the Services to be performed by Vendor under or pursuant to this Agreement or upon the breach by or failure of Vendor to perform any of its obligations or covenants under this Agreement, (b) by Company, with or without cause, upon five (5) days written notice to Vendor, or (c) by Vendor upon the failure of Company to perform any of its material covenants and conditions hereunder which has not been cured within thirty (30) days following written notice from Vendor to Company, or, if cure is not possible within said thirty (30) day period, if Company has not taken meaningful steps within such time period to cure such default, or (d) the filing by or against any party of a petition for bankruptcy or for relief from creditors under any equivalent state law or regulation. Following any termination of this Agreement, Company shall only be required to pay to Vendor any compensation earned by Vendor for any Services satisfactorily performed by Vendor prior to the date of such termination, and Vendor shall reimburse Company for any portion of the Compensation that Company paid on or before termination that is not attributable to Services performed or provided prior to the termination. Without limitation of the foregoing, Company may terminate this Agreement upon written notice if: (i) the Event does not occur; (ii) the Event occurs at a location other than the Venue.

12. **Relationship of the Parties**. It is understood and agreed that Company and Vendor are independent contractors, and nothing contained in this Agreement, nor any act of the parties, shall be deemed or construed to create the relationship of employer and employee, principal and agent, partnership or joint venture between Company and Vendor. Neither party hereto shall hold itself out to be anything other than an independent contractor, and neither party hereto shall incur or purport to incur liability on behalf of the other nor has any authority to assume or create any obligation or liability of any kind on behalf of the other.

13. **Intellectual Property**. Each party agrees that (a) nothing in this Agreement is intended to convey any ownership or other rights in the trademarks, service marks, copyrights or other intellectual property rights belonging to either party (or their respective affiliates) or the Event (sometimes collectively and individually referred to herein as, the "Trademarks"), (b) ownership of all such Trademarks shall remain the property of their owners, and (c) neither party will use any Trademarks under any circumstances without the prior written consent of the owner, which consent the owner may withhold in its sole and absolute discretion. Notwithstanding anything to the contrary contained herein, Vendor acknowledges that Company and its designees may film footage and photograph activities from the Event; accordingly Vendor grants Company a non-exclusive, perpetual, worldwide, license to use the Vendor's trademarks, and Vendor shall ensure that its agents, contractors, and employees license to Company the right to their likeness, to the extent such are incorporated in an incidental manner in audio visual productions and other promotional materials created by Company or its designees concerning the Event and in connection with the exploitation, marketing and promotion of such productions, in any manner or medium now known or hereafter devised.

14. **Confidential Information; Non-Disparagement**.

a. As used in this Agreement, "Confidential Information" means all confidential and proprietary information of a party (the "Disclosing Party") disclosed to the other party (the "Receiving Party") that is marked as confidential at the time of disclosure or which if disclosed orally is identified as confidential at the time of disclosure and for which a written summary, which is marked as confidential, is provided to the receiving party within thirty (30) days thereafter, or which a reasonable business person would consider confidential, including supplier lists, customer lists, financial information, product plans, ideas, and marketing plans. Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) was independently developed by the Receiving Party without breach of any obligation owed to the Disclosing Party; or (iv) is received from a third party without breach of any obligation owed to the Disclosing Party.

b. The Receiving Party shall not disclose or use any Confidential Information of the Disclosing Party, except with the Disclosing Party's prior written permission, which may be withheld in the Disclosing Party's absolute discretion. Each party agrees to protect the confidentiality of the Confidential Information of the other party in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind (but in no event using less than reasonable care).

c. If the Receiving Party is compelled by law to disclose Confidential Information of the Disclosing Party, it shall provide the Disclosing Party with prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party discloses or uses (or threatens to disclose or use) any Confidential Information of the Disclosing Party in breach of confidentiality protections contained in this Agreement, the Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such acts, it being specifically acknowledged by the parties that any other remedies may be inadequate.

d. Vendor agrees, for itself and its Representatives, that neither it nor any of its Representatives will (i) make any statements about Company or its affiliates (or any of their respective employees, agents, members, directors, officers, products, and/or services, including without limitation the Event) that are false, misleading, disparaging or defamatory; (ii) take any other action whatsoever that disparages, defames, sullies or compromises the goodwill, name, brand or reputation of Company or any of its affiliates (or any of their respective employees, agents, members, directors, officers, products, and/or services, including without limitation the Event) (collectively, the "Goodwill"), or (iii) commit any other act that could likely injure, hinder or interfere with Company's or any of its affiliates' businesses, business relationships or the Goodwill.

e. The obligation to maintain confidentiality and non-disparagement provided herein shall survive any termination or expiration of the Term and may be enforced by injunctive relief or other equitable or legal remedies without the necessity of proving inadequacy of legal remedies and without proving that Company or any of its affiliates or representatives would suffer irreparable harm as a result of a violation of such confidentiality and/or non-disparagement obligation(s). Any public announcement regarding this Agreement or the Event may be made only by Company.

EXHIBIT H-5    AEG 000084

15. **Force Majeure Event**. The failure of any party to comply with its obligations hereunder shall be excused to the extent such party's performance has been rendered impossible and/or impracticable as a result of illness or death of an artist or other artist unavailability, an act of God, strike, labor dispute, war, fire, earthquake, act of public enemies, acts of terrorism, action of federal, state or local governmental authorities, disease, epidemic, pandemic and/or other public health emergency (including the continued effects thereof, which may include, for example, the lack of available medical supplies), or for any other reason beyond the reasonable control of the party claiming protection by reason of such force majeure event (a "Force Majeure Event"). In the event that the Event or any portion thereof is cancelled by reason of a Force Majeure Event, Company may terminate this Agreement immediately as to that Event or such portion thereof and shall have no further obligations to Vendor hereunder as it relates to that Event or such portion thereof, provided that (a) Company shall pay to Vendor any Compensation earned by Vendor for any Services satisfactorily performed by Vendor prior to the date of such termination, and (b) all Compensation already paid by Company to Vendor, except for such Compensation that is attributable to the Services satisfactorily performed, shall be returned to Company.

16. **COVID-19**.

a. Vendor acknowledges the existence of the COVID-19 pandemic, the contagious nature of COVID-19 and the known and potential risks of providing the Services at or in connection with the Event, including without limitation the risks associated with Vendor's Representatives being in public, outside their homes, in close proximity to other individuals and possible exposure to COVID-19, which could result in quarantine requirements, serious illness, disability and/or death. Vendor also acknowledges that the hazards and risks associated with COVID-19 cannot be fully eliminated and that there is no guarantee, express or implied, that Vendor's Representatives will not be exposed to COVID-19.

b. Subject to the provisions of the Force Majeure provision above and notwithstanding the hazards and risks associated with COVID-19, Vendor willingly and voluntarily seeks to proceed with providing the Services at or in connection with the Event, as described in this Agreement (including the attachments hereto), and assumes the full risk of proceeding with the provision of such Services. Vendor shall be solely responsible for providing its Representatives with proper personal protective equipment and infection prevention supplies needed for performance of the Services.

c. Vendor shall indemnify and hold harmless the Company Indemnitees from all Claims arising from or out of, or relating to, directly or indirectly, COVID-19 or any other illness or injury that may incur at the Event out of or in connection with the performance of the Services, regardless of whether caused by the negligence or other fault of Vendor, Company or third parties. Vendor hereby forever releases, waives, discharges and covenants not to sue the Company Indemnitees for any Claims associated with COVID-19. Vendor understands and agrees that Company shall not be responsible for any Claims arising from or out of, or relating to, directly or indirectly, COVID-19 or any other illness or injury that may incur at the Event out of or in connection with the performance of the Services, regardless of whether caused by the negligence or other fault of Vendor, Company or third parties and Company accepts no liability for such Claims.

d. Vendor shall ensure that prior to entering the Event and/or the Venue for the performance of the Services, each of its Representatives signs a "*Waiver, Release of Liability, Assumption of Risk and Covenant not to Sue*" in the form set forth on Exhibit A attached hereto and made a part hereof. Vendor shall also ensure that none of Vendor's Representatives enter the Event and/or the Venue for the performance of any Services if at any time within 14 days prior to such entry such Representative was outside the United States, was diagnosed with COVID-19, exhibited symptoms of COVID-19 or was in contact with someone who has been confirmed or suspected of having COVID-19.

e. Without limiting the generality of the Force Majeure provision above, Company reserves the right to terminate this Agreement immediately in its entirety, or as to a specific portion of the Services, if the Event or any portion thereof is cancelled, the Event or the Venue capacity is limited, and/or the Event or Venue operations are adversely impacted due to government restrictions or recommendations related to COVID-19, or if Company, in its sole discretion, does not believe that public health conditions warrant permitting the Services to be performed at or in connection with the Event as contemplated herein. Following any such termination, Company shall have no further obligations to Vendor hereunder as it relates to the Agreement, or to the terminated portion of the Services, or to the terminated Event or portion thereof, as applicable, provided that (i) Company shall be obligated to pay to Vendor any Compensation earned by Company for any Services satisfactorily performed by Vendor prior to the date of such termination, and (ii) all Compensation already paid by Company to Vendor, except for such Compensation that is attributable to the Services satisfactorily performed, shall be returned to Company.

17. **Limitation of Liability**. Neither Party shall be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, investments, leases or commitments in connection with the Parties' or the Event's business or goodwill. The Parties shall in no event be liable or obligated under any provision of this Agreement or under contract, negligence, strict liability or other legal or equitable theory for any indirect, special, incidental, consequential or punitive damages or lost profits. The foregoing limitation shall not apply to intentional or willful misconduct or to the indemnification obligations set forth in Section 8.

18. **Notices**. All notices and communications regarding the performance and responsibilities of the respective parties and otherwise given by either party to the other party to this Agreement shall be in writing and shall be delivered in person (by hand or by messenger), or shall be sent by regular or certified mail, return receipt requested or U.S. Postal Service Express Mail or Federal Express, UPS or other similar recognized private overnight delivery service, prepaid. Notice given as provided herein shall be deemed to have been given on the date it was received as evidenced by signature, or date of first refusal, if that be the case. Notice hereunder shall be addressed to the parties at the addresses first set forth above, with a copy of all notices to Company sent to: Adam D. Mandell, Esquire, Millen, White, Zelano & Branigan, P.C., 2200 Clarendon Blvd., Ste. 1400, Arlington, Virginia 22201. Either party may change the address at which it receives notices by notifying the other party of such change in the manner provided herein.

19. **Assignment**. Neither party shall have the right or power to assign its rights or obligations under this Agreement without the written consent of the other party. Notwithstanding the foregoing, Company may assign this Agreement or any of its rights and obligations hereunder to (i) an affiliated or related party, or (ii) any person that acquires all or substantially all of the assets of the party, in each case, as applicable, without the prior written consent of Vendor. Any purported assignment not in accordance with this section shall be null and void.

20. **Waiver**. The failure of either party to enforce any provision or condition contained in this Agreement at any time will not be construed as a waiver of that condition or provision nor will it operate as a forfeiture of any right of future enforcement of the condition or provision.

21. **Entire Agreement**. This Agreement contains the entire agreement between the parties and merges any prior representations, warranties, or understandings they may have had regarding the subject matter of this Agreement. This Agreement may not be amended or modified except by a writing executed by both parties.

22. **Counterpart; Electronic Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original. Electronic copies, PDFs, facsimile copies or photocopies of signatures shall be as valid as originals.

23. **Governing Law; Forum Selection Clause**. THIS AGREEMENT (AND ALL EXHIBITS WHICH ARE PART OF THIS AGREEMENT) HAS BEEN ENTERED INTO IN THE STATE OF CALIFORNIA AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN SUCH STATE WITHOUT REGARD TO ITS CHOICE OF LAW RULES. THE CALIFORNIA COURTS (STATE AND FEDERAL) ONLY WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT AND THE PARTIES HERETO CONSENT TO JURISDICTION OF SAID COURTS. ANY PROCESS IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY, AMONG OTHER METHODS, BE SERVED ON COMPANY OR VENDOR, AS APPLICABLE, BY DELIVERING IT OR MAILING IT TO COMPANY OR VENDOR, AS APPLICABLE. ANY SUCH DELIVERY OR MAIL SERVICE WILL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE IN CALIFORNIA.

24. **Records/Audits**. To the extent necessary to calculate the total payments due to Vendor hereunder, Vendor shall keep records of expenses pertaining to the Services in sufficient detail to allow Company to fully review, audit and understand the same. Company shall have the right at any time and from time to time to audit Vendor's billings and records associated with the Services. Vendor shall maintain, preserve, and make available for inspection,

audit, and reproduction, for at least twenty-four (24) months following the submission of the final invoice, the books, records, agreements, and other documents used in determining any cost incurred and billed to Company during the performance of this Agreement. If any such audit reveals inaccuracies in the billings, the necessary adjustment shall be made promptly.

25. **Severability**. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect the other provisions of this Agreement provided that the material terms of this Agreement can be given their intended effect without the invalid provisions, and to this extent the provisions of this Agreement are declared to be severable.

26. **Attorney's Fees**. In the event litigation arises in connection with the provisions of this Agreement, the Party or Parties who prevail in enforcing this Agreement or obtaining a more favorable interpretation of this Agreement shall be entitled from the non-prevailing party to reasonable attorneys' fees and costs incurred in connection therewith.

27. **Conflict of Provisions**. In the event that there exists a conflict between any term, condition, or provision contained within the Agreement for Services and/or any exhibit to this Agreement, and in any term, condition, or provision contained within the Terms & Conditions, the term, condition, or provision contained within the Terms & Conditions shall control.

## EXHIBIT A

### WAIVER, RELEASE OF LIABILITY, ASSUMPTION OF RISK AND COVENANT NOT TO SUE ("WAIVER")

*PLEASE READ THIS WAIVER CAREFULLY, AS IT AFFECTS YOUR FUTURE LEGAL RIGHTS. BY SIGNING BELOW, YOU ACKNOWLEDGE, AGREE AND REPRESENT (ON BEHALF OF YOURSELF AND/OR YOUR MINOR CHILD AND ANY PERSONAL REPRESENTATIVES, HEIRS AND NEXT OF KIN) THAT YOU HAVE CAREFULLY READ, FULLY UNDERSTOOD AND AGREED TO ALL TERMS. IN CONSIDERATON OF BEING PERMITTED TO ENTER THE VENUE, EVENT OR OFFICE (AS APPLICABLE) (COLLECTIVELY, "FACILITY"), YOU AGREE TO THE FOLLOWING:*

**FACILITY:** LOST LANDS MUSIC FESTIVAL AT LEGEND VALLEY IN THORNVILLE, OHIO

1. I understand that COVID-19 has been declared a worldwide pandemic by the World Health Organization and that COVID-19 infections and deaths have been confirmed throughout the United States, including in the state where the Facility is located.

2. I understand the known and potential risks of COVID-19, including quarantine, serious illness, disability and death. I also understand, acknowledge and agree that (a) these risks cannot be fully eliminated and are increased by proximity to other people, (b) there is an inherent and elevated risk of exposure to COVID-19 in any public place or place where people are present, and (c) there is no guarantee, express or implied, that I will not be exposed to COVID-19. Despite these risks, I voluntarily agree to enter the Facility and assume all risks associated with COVID-19.

3. I will not enter the Facility if I answer "YES" to any of the following questions on behalf of myself and/or my minor child:

   - **IN THE PAST 14 DAYS, HAVE YOU BEEN DIAGNOSED WTH COVID-19?**
   - **IN THE PAST 14 DAYS, HAVE YOU EXHIBITED SYMPTOMS OF COVID-19, INCLUDING ONE OR MORE OF THE FOLLOWING?**

     - FEVER OR CHILLS
     - COUGH
     - SHORTNESS OF BREATH OR DIFFICULTY BREATHING
     - FATIGUE
     - MUSCLE OR BODY ACHES
     - HEADACHE
     - NEW LOSS OF TASTE OR SMELL
     - SORE THROAT
     - CONGESTION OR RUNNY NOSE
     - NAUSEA OR VOMITING
     - DIARRHEA

   - **IN THE PAST 14 DAYS, HAVE YOU BEEN IN CONTACT WITH SOMEONE WHO HAS BEEN CONFIRMED OR SUSPECTED OF HAVING COVID-19?**

4. While at the Facility, I will follow the recommendations of the Centers for Disease Control and Prevention to reduce the spread of COVID-19, including the following:

   - **WEAR A CLOTH FACE COVERING:** Wear a cloth face covering while working or in close proximity to other people.
   - **PRACTICE SOCIAL DISTANCING:** Avoid large gatherings and maintain distance (at least 6 feet) from others when possible.
   - **FOLLOW HAND HYGIENE AND RESPIRATORY ETIQUETTE:**
     - Wash hands often with soap and water for at least 20 seconds or use hand sanitizer with at least 60% alcohol if soap and water are not available. Key times to clean hands include the following: before and after work shifts; before and after work breaks; after using the restroom; before eating or preparing food; and after putting on, touching or removing cloth face coverings.
     - Cover the mouth and nose with a tissue when coughing and sneezing. Used tissues should be thrown in the trash and hands washed immediately with soap and water for at least 20 seconds.

5. If I develop symptoms of COVID-19 while at the Facility, I will immediately separate myself from other people and leave the Facility.

6. I release, waive, discharge and agree not to sue Apex Event Management, LLC, Lost Lands Festival, Excision, Steve and Laura Trickle, Legend Valley, LLC, Trickle Productions LLC, Madison House Presents, LLC, AEG Presents LLC, Anschutz Entertainment Group, Inc., any Facility sponsors and their respective parents, subsidiaries, affiliated companies, owners, members, managers, directors, officers, past and present employees, volunteers, agents, representatives, successors and assigns (collectively, the "Releasees") for any known or unknown claims, losses, damages, liability, demands, actions, injury or death relating to COVID-19 or any other illness or injury that I (and/or my minor child) may sustain while in the Facility, regardless of whether caused by the negligence or other fault of Releasees or any third party (collectively, "Claims"). I also agree to indemnify, defend and hold harmless the Releasees from all Claims.

   *For California residents:* I understand that this Waiver applies to Claims which I may not know or suspect to exist and I knowingly and voluntarily waive such rights, including those under California Civil Code Section 1542, which provides: *"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party."*

7. This Waiver is the entire agreement between the parties, shall be legally binding to the fullest extent permitted by law and is intended to be as broad and inclusive as permitted by the laws of the state of California. Any dispute relating to the Facility or this Waiver shall be submitted to the exclusive jurisdiction of the state or federal courts of Los Angeles, California. If any part of this Waiver is deemed to be unenforceable, the balance shall continue in full legal force and effect.

BY SIGNING BELOW, I ACKNOWLEDGE AND REPRESENT THAT I have read and understood the terms of this Waiver and sign it voluntarily, I am at least eighteen (18) years old and fully competent and I intend that I (and/or my minor child, personal representatives, heirs and next of kin) will be bound by its terms.

SIGNATURE: _____ NAME OF COMPANY YOU
PRINTED NAME: _____ REPRESENT (IF APPLICABLE): _____
DATE: _____

EXHIBIT H-9