DocuSign Envelope ID: E71FD353-9579-4B65-B242-4A036D1FAAAD

## AGREEMENT FOR SERVICES

THIS AGREEMENT FOR SERVICES (this "Agreement") is made effective as of the later of the dates set forth below the signatures below (the "Effective Date") by and between Madison House Presents, LLC ("MHP"), a Delaware limited liability company, with offices at 1401 Walnut Street, Suite 500, Boulder CO 80302 and Apex Event Management, LLC ("Company"), a Delaware limited liability company with offices at 16000 Ventura Blvd., Suite #600, Encino, CA. 91436 (collectively, the "Parties").

Company promotes and produces the Lost Lands Music Festival, scheduled to be held on dates to be determined in September 2020, 2021 and 2022 (the "Events" or, in the singular, the "2020 Event," "2021 Event" and the "2022 Event") currently expected to be held at Legend Valley in Thornville, Ohio (the "Venue").

Company desires to engage MHP for services in connection with the Events, and MHP desires to provide such services, on the terms and conditions set forth in this Agreement.

In consideration of the mutual covenants that are contained in this Agreement, the Parties hereby agree as follows:

1. <u>Scope of Services</u>. Company hereby engages MHP, and MHP hereby agrees, to provide: (a) the staff members more fully described on <u>Exhibit A</u> attached hereto and made a part hereof (the "MHP Staff"); and (b) the services more fully described on <u>Exhibit B</u> attached hereto and made a part hereof (the "Services"). Unless expressly stated otherwise, the costs of MHP Staff and the Services are included in the Compensation. For the avoidance of doubt, the Services include: (a) the services for which MHP is directly responsible and will be provided by MHP Staff; and (b) management and oversight of services to be provided by third party vendors (the "Third Party Vendors"). Company will give MHP that number passes to the Event mutually determined by the Parties for MHP's employees actually working at the Event.

2. <u>Company Obligations</u>. In addition to all responsibilities and obligations set forth herein, Company will be responsible for those items set forth in <u>Exhibit B</u> attached hereto and made a part hereof. Company understands and agrees that MHP shall identify Third Party Vendors to assist with the Event but that such Third-Party Vendors shall enter into agreements directly with Company and that, as between MHP and Company, Company shall at all times remain responsible for the agreed upon fees, expenses, wages and costs associated with the Third-Party Vendors.

3. <u>Term</u>.
   a. The term of this Agreement shall commence as of the Effective Date hereof and expire on the later of October 31, 2022, or the date on which all obligations of the parties have been fulfilled ("Term"), unless sooner terminated in accordance with the terms and conditions of this Agreement.
   b. MHP's services relating to management of the food concessions program at the Events shall initially only apply to the 2020 Event; however, Company may, in its sole discretion and on or before the December 15 preceding the 2021 Event and/or the 2022 Event exercise an option for MHP to manage the food concessions program at the 2021 and 2022 Events upon the same terms and conditions as are applicable to the 2020 Event; the budget for the food concessions program at the 2021 and/or 2022 Events (if applicable) will be subject to Company's prior written approval.

4. <u>Compensation</u>. As full and complete compensation for the Services to be provided by MHP pursuant to this Agreement, each year of the Term Company shall remit the following payments to MHP (the "Compensation") on the schedule set forth below:

- ***MHP Fee***: Seven Hundred Thousand Dollars ($700,000) per Event. Company understands and agrees that the MHP Fee does not include the travel and expenses described below or Third-Party Vendor costs, which shall be Company's responsibility.
- 
  o **2020 Event MHP Fee**
    - One Hundred and Seventy-Five Thousand Dollars ($175,000) due within five (5) business days after the Effective Date;
    - One Hundred and Seventy-Five Thousand Dollars ($175,000) due no later than fifteen (15) business days after tickets to the 2020 Event go on-sale to the public;
    - One Hundred and Seventy-Five Thousand Dollars ($175,000) due no later than thirty (30) days prior to the first day of the 2020 Event;
    - One Hundred and Seventy-Five Thousand Dollars ($175,000) due no later than ten (10) days after the conclusion of the 2020 Event; and

AEG 000064

EXHIBIT I-1

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

- The balance due no later than thirty (30) days after the conclusion of the 2020 Event.
- **2021 and 2022 Event MHP Fees**
  - The Parties shall agree on the timing of the 2021 and 2022 Event MHP Fees no later than December 31 each year; in the event the Parties cannot agree on such payment timing, then the same timeline that is in effect for the 2020 Event shall apply provided that under no circumstances will any portion of the MHP fee be required before the later of either: (a) 15 business days after tickets to the 2021 or 2022 Event (as applicable) go on-sale to the public; or (b) the December 15 preceding the 2021 Event and/or the 2022 Event (as applicable).
- **Bonus**: For each Event, MHP shall be entitled to the following cumulative bonus based on the number of paid unique attendees at each Event, to be paid no later than ten (10) days after the conclusion of the applicable Event. A "paid unique attendee" is an individual person that pays for entry to the Event. For the avoidance of doubt, each paid unique attendee is counted only once regardless of their attendance at multiple days throughout the Event.
  - Thirty-Five Thousand Dollars ($35,000) if the applicable Event achieves 37,000 unique paid attendees;
  - An additional Thirty Thousand Dollars ($30,000) if the applicable Event achieves 38,000 unique paid attendees;
  - An additional Thirty Thousand Dollars ($30,000) if the applicable Event achieves 39,000 unique paid attendees; and
  - An additional Thirty Thousand Dollars ($30,000) if the applicable Event achieves 40,000 unique paid attendees.
- **Food Commission**: For each Event at which it manages the food concessions program, MHP shall be entitled to receive Five Percent (5%) of the Adjusted Gross Revenue for food sales at the applicable Event. Adjusted Gross Revenue means all sales receipts from food concessions as the Event, less applicable taxes and credit card fees. All expenses associated with the food program shall be Event expenses consistent with the prior Event as a baseline, but which are not currently anticipated to exceed one hundred and twenty thousand dollars ($120,000); the budget for the food concessions program at the 2021 and/or 2022 Events (if applicable) will be subject to Company's prior written approval.
- **Sponsorship**
  - **Commission**: Fifteen Percent (15%) commission (the "Commission") on any gross sponsorship revenue including cash and in-kind donations that offset actual costs that would have been incurred by Company and net of directly related expenses ("Gross Sponsorship Revenue") secured by MHP and/or AEG Presents. As used in this Agreement, the term "secured by MHP" means selected by MHP and/or AEG Presents and procured by MHP and/or AEG Presents, substantially through the efforts of MHP and/or AEG Presents. For the avoidance of doubt, the foregoing commission does not apply to any sponsorship revenue not secured by MHP and/or AEG Presents at any time before or after the Effective Date of this Agreement and does not apply specifically to the existing agreement between Company and Red Bull and/or those sponsors set forth on Exhibit C. If an increase in the amount of the Red Bull sponsorship is secured by MHP, then such increased amount shall be considered to be Gross Sponsorship Revenue.
  - **Commission Increase**: In the event that Gross Sponsorship secured by MHP and/or AEG Presents meets or exceeds three hundred thousand dollars ($300,000.00) with respect to any particular Event, the Commission will increase to thirty percent (30%) for that particular Event. For the avoidance of doubt, the foregoing commission does not apply to any sponsorship revenue not secured by MHP and/or AEG Presents at any time before or after the Effective Date of this Agreement and does not apply specifically to Red Bull.
  - The sponsorship-related fees set forth above shall be paid to MHP within thirty (30) days of Company's receipt of such fees from the applicable sponsor.
- **Travel and Expenses**: MHP Staff travel, lodging and other out-of-pocket expenses, which shall be pre-approved by Company and billed to Company in addition to the Fee. It is generally understood that on-site accommodations will consist of RV/trailers, and travel expenses for airline tickets, when applicable, will be economy class; provided that different accommodations and travel expenses may be pre-approved by Company.
  - Paid to MHP within ten (10) days of receipt of an invoice from MHP.

5.  Safety and Legal Requirements; Authority. Without in any way limiting any other term or provision of this Agreement or any obligations hereunder, the Parties shall do or cause to be done all of the following: (a) produce the Events (in the case of Company) and perform the Services (in the case of MHP) in a first-class manner that shall protect the health and safety of the Parties' employees, agents and the public generally; (b) comply with all laws, policies, rules, and regulations applicable to the production of the Event and the Services; and (c) obtain, maintain and comply with all licenses, permits, franchises and approvals from any governmental authority that may be required to enable Company to produce the Events and for MHP to perform all of the Services.   Each Party represents

AEG 000065

EXHIBIT I-2

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

and warrants that it has the full right and authority to enter into and fully perform this Agreement in accordance with its terms and that this Agreement constitutes a valid, binding and enforceable agreement, and the execution, delivery and performance of this Agreement will not violate the provisions of any agreement to which it is a party or by which it is bound.

6. Indemnification.

(a) Company agrees to indemnify, defend and forever save and hold harmless MHP, its affiliates or related entities, and each of their respective principals, shareholders, members, partners, officers, directors, employees, representatives, tenants, agents, contractors and volunteers (sometimes collectively referred to herein as the "MHP Indemnitees" and individually as a "MHP Indemnitee"), from and against any and all damages, claims, losses, demands, costs, expenses (including attorneys, fees and costs), obligations, liens, liabilities, actions and causes of action, threatened or actual, which any one of the MHP Indemnitees may suffer or incur arising directly or indirectly out of or in connection with any breach by Company or its affiliates, officers, directors, shareholders, members, managers, agents, subcontractors and employees of any of its representations, warranties or obligations hereunder or their negligence or willful misconduct, except to the extent attributable to the gross negligence or willful misconduct of MHP. This section shall survive the expiration or termination of this Agreement.

(b) MHP agrees to indemnify, defend and forever save and hold harmless Company, its affiliates or related entities, and each of their respective principals, shareholders, members, partners, officers, directors, employees, representatives, tenants, agents, contractors and volunteers (sometimes collectively referred to herein as the "Company Indemnitees" and individually as a "Company Indemnitee"), from and against any and all damages, claims, losses, demands, costs, expenses (including attorneys, fees and costs), obligations, liens, liabilities, actions and causes of action, threatened or actual, which any one of the Company Indemnitees may suffer or incur arising directly or indirectly out of or in connection with the gross negligence or willful misconduct of MHP. This section shall survive the expiration or termination of this Agreement.

7. Insurance.
   c. *MHP Insurance.* MHP shall, at its sole cost and expense, procure and maintain in force with duly licensed insurance carriers the following occurrence-based insurance for the Term: (i) worker's compensation insurance coverage adequate to comply with all statutory requirements covering all persons employed by MHP hereunder and employer's liability with minimum limits of at least One Million Dollars (US$1,000,000), including a waiver of subrogation; (ii) a commercial general liability insurance policy covering bodily injury and property damage liability, personal and advertising injury liability and errors and omissions injury liability, with minimum limits of not less than Five Million Dollars (US$5,000,000) per occurrence and Ten Million Dollars (US$10,000,000) in the aggregate, including a waiver of subrogation; and (iii) to the extent applicable as it would pertain to the obligations hereunder, business auto liability insurance with a limit of not less than One Million Dollars (US$1,000,000) combined single limit providing coverage for all owned, hired and borrowed automobiles. Any combination of primary and umbrella liability insurance shall satisfy the requirements herein. Within seven (7) days of the execution of this Agreement, MHP will deliver to Company certificates of insurance evidencing the existence of the insurance required by this Agreement and with an endorsement which shall endorse Apex Event Management, LLC, Lost Lands Festival, Excision, Steve and Laura Trickle, Legend Valley LLC, Trickle Productions LLC and each of their respective parents, affiliates, subsidiaries, officers, directors, representatives, shareholders, members, agents, employees, subcontractors and any other party reasonably designated by Company as an additional insured under the policies in sub-paragraphs (i)-(iii) above as an additional insured under the policies in sub-paragraphs (ii) and (iii) above. A blanket additional insured endorsement shall satisfy this requirement. Such certificates shall also provide that such coverage will not be canceled or the subject of a material adverse amendment without at least ten (10) days prior written notice to Company. Upon any cancellation and/or material adverse amendment of any such insurance coverage, and prior to the effective date thereof, MHP will deliver evidence of replacement insurance to Company.

   d. *Company Insurance.* Company shall, at its sole cost and expense, procure and maintain in force with duly licensed insurance carriers the following occurrence-based insurance for the Term: (i) worker's compensation insurance coverage adequate to comply with all statutory requirements covering all persons employed by Company hereunder and employer's liability with minimum limits of at least One Million Dollars (US$1,000.000), including a waiver of subrogation; (ii) a commercial general liability insurance policy covering bodily injury and property damage liability, personal and advertising injury liability and errors and omissions injury liability, with limits of not less than Five Million Dollars (US$5,000,000) per occurrence and Ten Million Dollars (US$10,000,000) in the aggregate, including a waiver of subrogation; and (iii) to the extent applicable as it would pertain to the obligations hereunder, business auto liability insurance with a limit of not less than One Million Dollars (US$1,000,000) combined single limit

AEG 000066

EXHIBIT I-3

DocuSign Envelope ID: E71FD353-9579-4B65-B242-4A036D1FAAAD

providing coverage for all owned, hired and borrowed automobiles. Any combination of primary and umbrella liability insurance shall satisfy the requirements herein. The insurance required in sub-paragraphs (ii) and (iii) hereunder shall be primary and non-contributory insurance and all insurance carried by MHP, its agents, employees, and the parties for which it is operating, shall be considered secondary in relation thereto. On or before September 1, 2020, Company will deliver to MHP certificates of insurance evidencing the existence of the insurance required by this Agreement and with an endorsement which shall endorse MHP, AEG Presents LLC, Anschutz Entertainment Group Inc. and each of their respective parents, affiliates, subsidiaries, officers, directors, representatives, shareholders, members, agents, employees, subcontractors and any other party reasonably designated by MHP, as additional insureds under the policies in sub-paragraphs (ii) and (iii) above. A blanket additional insured endorsement shall satisfy this requirement. Such certificates shall also provide that such coverage will not be canceled or the subject of a material adverse amendment without at least ten (10) days prior written notice to MHP. Upon any cancellation and/or material adverse amendment of any such insurance coverage, and prior to the effective date thereof, Company will deliver evidence of replacement insurance to MHP.

e. *Liquor Liability Insurance*. Either (i) Company shall, at its sole cost and expense, procure and maintain, or (ii) Company shall require the Event concessionaire, at its sole cost and expense, to procure and maintain the following with duly licensed insurance carriers: liquor liability insurance with limits of not less than Five Million Dollars (US$5,000,000.00) per occurrence and Ten Million Dollars (US$10,000,000) in the aggregate, including a waiver of subrogation, which shall endorse the parties set forth in subsection (b) above as additional insureds.

f. *Event Cancellation Insurance*. Company shall procure and maintain with duly licensed insurance carriers event cancellation insurance in an amount consistent with industry standards for similarly-sized festivals based on existing market conditions and with assistance and input from MHP, including terrorism and FEAR coverage, for each Event; such coverage will be considered a show expense and will cover all Event-related expenses, including the MHP Fee and any other amounts due to MHP. In the event of a partial or full cancellation of an Event, Apex shall be responsible for all contractual commitments owed in connection with the Event, including (without limitation) ticketholders, vendors, suppliers, etc. Notwithstanding the foregoing, Company is not required to procure rain-out insurance.

8. Termination.

   a. *Termination For Cause*. This Agreement may be terminated for cause by either party upon written notice to the other party upon the happening of any one of the following: (i) the filing by or against either party of a petition for bankruptcy or for relief from creditors under any equivalent state law or regulation, (ii) if there is a material breach, failure to perform or default by the other party in the performance of any of its material obligations, representations or warranties provided for in this Agreement, and such material breach, failure to perform or default, if curable, is not cured within three (3) days of one party's receipt of written notice from the other, or (iii) if there is a breach, failure to perform or default by the other party in the performance of any of its obligations, representations or warranties provided for in this Agreement, and, if curable, such breach, failure to perform or default is not cured within thirty (30) days of one party's receipt of written notice from the other. In the event this Agreement is terminated by Company in accordance with parts (ii) or (iii) of this paragraph set forth above, Company shall only be required to pay MHP that portion of the Compensation (including costs incurred) attributable to Services performed or provided prior to the termination. In the event this Agreement is terminated by MHP in accordance with parts (ii) or (iii) of this paragraph set forth above, MHP shall be entitled to all unpaid Compensation on or before the date of notice if termination and costs incurred (as described more fully in Section 4).

   b. *Termination For Convenience/Early Termination Fee*. Company may terminate this Agreement by notifying MHP in writing prior to December 15 of the year prior to the applicable Event and payment to MHP of Early Termination Fee set forth below plus all pre-approved out-of-pocket expenses. If Company seeks to terminate this Agreement for convenience pursuant to this Section 8(b), it shall pay MHP Two Hundred Thousand Dollars ($200,000) ("Early Termination Fee") to be paid over the course of six (6) calendar months on equal monthly installments beginning on the immediately following applicable January 1. MHP expressly acknowledges and agrees that the Early Termination Fee is the exclusive remedy for Company's early termination pursuant to Section 8(b), but it shall not apply to any other outstanding obligations that may exist at the time of termination, including (without limitation), Company's indemnification or payment obligations relating to Events that have occurred.

AEG 000067

EXHIBIT I-4

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

    c. **Termination For Loss Of Key Personnel.** Company may terminate this Agreement at any time if any two (2) of the following four (4) individuals are no longer involved in providing the Services: Jeremy Stein; Chad Cheek; Jason Miller; and/or Michael Sampliner. MHP shall promptly provide Company notice in the event that any of the foregoing individuals are no longer involved in providing the services. In order to exercise its rights pursuant to this Section 8(c), Company shall (i) notify MHP in writing of its intent to terminate and, upon confirmation by MHP that two of the four individuals are no longer involved, Company shall (ii) pay MHP all pre-approved out-of-pocket expenses. MHP shall reimburse Company for any Compensation with respect to the next Event paid on or before the date of notice of termination less all pre-approved out of pocket expenses.

    d. **Termination for Election to Discontinue Event.** Company may elect at any time on or before the December 31 preceding any Event provide notice to MHP that that Company will not produce and/or promote the Lost Lands Music Festival in which case Company may terminate this Agreement without penalty, provided that Company shall pay MHP all pre-approved out-of-pocket expenses. For the sake of clarity, in the event that the Event(s) occur at dates and/or locations other than those listed in the preamble to this Agreement, it is anticipated that such changes will not affect the rights and/or obligations of the parties.

9. Relationship of the Parties. It is understood and agreed that Company and MHP are independent contractors, and nothing contained in this Agreement, nor any act of the parties, shall be deemed or construed to create the relationship of employer and employee, principal and agent, partnership or joint venture between Company and MHP. Neither party hereto shall hold itself out to be anything other than an independent contractor, and neither party hereto shall incur or purport to incur liability on behalf of the other nor has any authority to assume or create any obligation or liability of any kind on behalf of the other.

10. Intellectual Property. Each party agrees that (a) nothing in this Agreement is intended to convey any ownership or other rights in the trademarks, service marks, copyrights or other intellectual property rights belonging to either party (or their respective affiliates) or the Events (sometimes collectively and individually referred to herein as, the "Trademarks"), (b) ownership of all such Trademarks shall remain the property of their owners, and (c) neither party will use any Trademarks under any circumstances without the prior written consent of the owner, which consent the owner may withhold in its sole and absolute discretion.

11. Confidential Information. During the term of this Agreement, each party ("Receiving Party") may gain access or be exposed to certain confidential and proprietary information relating to the Event or the business of the other party ("Disclosing Party"). For the avoidance of doubt, overall Event budget and reprojection(s) (if any) constitute Company's confidential and proprietary information. The Receiving Party agrees, for itself and its representatives, that all such confidential and proprietary information shall remain and be kept in strictest confidence and shall not be disclosed to or used by any person or entity without the prior written consent of the Disclosing Party, which consent may be withheld by the Disclosing Party in its sole and absolute discretion. The obligation to maintain confidentiality provided herein shall survive any termination or expiration of the term of this Agreement and may be enforced by injunctive relief or other equitable or legal remedies without the necessity of proving inadequacy of legal remedies and without proving that the Disclosing Party or any of its affiliates or representatives would suffer irreparable harm as a result of a violation of such confidentiality obligation. Any public announcement regarding this Agreement shall be made only by mutual agreement of the Parties.

12. Force Majeure Event. The failure of any party to comply with its obligations hereunder shall be excused to the extent such party's performance has been rendered impossible as a result of illness or death of an artist or other artist unavailability, an act of God, strike, labor dispute, war, fire, earthquake, act of public enemies, acts of terrorism, action of federal, state or local governmental authorities or for any other reason beyond the reasonable control of the party claiming protection by reason of such force majeure event (a "Force Majeure Event"). In the event that the Event or any portion thereof is cancelled by reason of a Force Majeure Event, Company may terminate this Agreement and shall only be required to pay MHP for services performed or costs incurred prior to the cancellation.

13. Limitation of Liability. Neither Party shall be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, investments, leases or commitments in connection with the Parties' or the Event's business or goodwill. The Parties shall in no event be liable or obligated under any provision of this Agreement or under contract, negligence, strict liability or other legal or equitable theory for any indirect, special, incidental, consequential or punitive damages or lost profits. The foregoing limitation shall not apply to intentional or willful misconduct or to the indemnification obligations set forth in Section 6.

AEG 000068

EXHIBIT I-5

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

14. **Notices**. All notices and communications regarding the performance and responsibilities of the respective parties and otherwise given by either party to the other party to this Agreement shall be in writing and shall be delivered in person (by hand or by messenger), or shall be sent by regular or certified mail, return receipt requested or U.S. Postal Service Express Mail or Federal Express, UPS or other similar recognized private overnight delivery service, prepaid. Notice given as provided herein shall be deemed to have been given on the date it was received as evidenced by signature, or date of first refusal, if that be the case. Notice hereunder shall be addressed to the parties at the addresses first set forth above, with a copy of all notices to MHP sent to: AEG Presents LLC, 425 W. 11th Street, Suite 400, Los Angeles, CA 90015, Attn: Legal Counsel; and a copy of all notices to Apex Event Management, LLC sent to: Adam D. Mandell, Esquire, Millen, White, Zelano & Branigan, P.C., 2200 Clarendon Blvd., Ste. 1400, Arlington, Virginia 22201. Either party may change the address at which it receives notices by notifying the other party of such change in the manner provided herein.

15. **Assignment**. Neither party shall have the right or power to assign its rights or obligations under this Agreement without the written consent of the other party. Notwithstanding the foregoing, either party may assign this Agreement or any of its rights and obligations hereunder to (i) an affiliated or related party, or (ii) any person that acquires all or substantially all of the assets of the party, in each case, as applicable, without the prior written consent of the other party. For purposes of this Agreement, the term "affiliated or related party" means any person or company, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a party. Any purported assignment not in accordance with this section shall be null and void.

16. **Waiver**. The failure of either party to enforce any provision or condition contained in this Agreement at any time will not be construed as a waiver of that condition or provision nor will it operate as a forfeiture of any right of future enforcement of the condition or provision.

17. **Entire Agreement**. This Agreement contains the entire agreement between the parties and merges any prior representations, warranties, or understandings they may have had regarding the subject matter of this Agreement. This Agreement may not be amended or modified except by a writing executed by both parties.

18. **Counterpart; Electronic Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original. Electronic copies, PDFs, facsimile copies or photocopies of signatures shall be as valid as originals.

19. **Governing Law; Forum Selection Clause**. This Agreement and the parties' conduct arising out of or related to it shall be governed by California law, without regard to its choice of law rules. Any dispute arising out of or related to this Agreement must be brought in federal or state court in Los Angeles County, and the parties hereby consent to the exclusive jurisdiction and venue of such forum.

20. **Severability**. If any provision of this Agreement or the application thereof is held invalid, the invalidity shall not affect the other provisions of this Agreement provided that the material terms of this Agreement can be given their intended effect without the invalid provisions, and to this extent the provisions of this Agreement are declared to be severable.

21. **No Restrictions**. Nothing contained in this Agreement shall be deemed in any way to prohibit or restrict the right or freedom of either party to conduct any business activity unrelated to the Event or the Services without any obligation or accountability to the other even if such business or activity directly competes with the business of the other.

IN WITNESS WHEREOF, the parties have executed this Agreement and have made it effective.

COMPANY: Apex Event Management LLC  
By: *Jeffrey Abel*  
Name: Jeff Abel  
Title: President  
Date: January 24, 2020  

MADISON HOUSE PRESENTS, LLC  
By: *Jeremy Stein*  
Name: Jeremy Stein  
Title: Co-President  
Date: 1/27/2020

AEG 000069

EXHIBIT I-6

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

**EXHIBIT A**

"MHP Staff":

- "MHP Executive Team"
  - Jeremy Stein
  - Michael Sampliner
  - Chad Cheek
  - Darcy Johnson

- "MHP Festival Team" or "MHP FTE Staff Positions") (to be directed by Executive Team in execution of MHP Services):
  - One (1) Senior Site Operations Director – Jason Miller
  - One (1) Site Operations Lead – Kohn Dwight
  - One (1) Site Coordinator – Kayleigh Neu
  - One (1) Festival Operations Analyst - Beau Beckley
  - One (1) Festival Artist Advance & Communications (i.e., liaison between legal, finance, production and artist relations) – Joanna Jackson
  - One (1) Festival Operation Manager – Kim Stetler
  - One (1) Festival Lodging Coordinator – Kristen Vinson
  - One (1) Festival Contracts Manager – Tessa Rochon
  - One (1) Festival Accountant – Hannah Belsky
  - One (1) Marketer, Digital Production Manager – Andrew Stone
  - One (1) Festival Marketing Assistant – Jake Frommer
  - Administrative assistant – Sydney Schavietello

*MHP Festival Staff is provided by position. Assigned team member is provided based on current available MHP staff. In the event an employee is either re-assigned or is no longer an employee of MHP, MHP will replace the respective employee to fill role at no additional expense to Company; provided, however, that should two of the four individuals described in Section 8(c) of the Agreement no longer be involved with the Event, Company shall have the termination rights set forth in therein.*

MHP shall use its best efforts to provide to Company no later than January 31 of each year during the Term an initial draft of a schedule of MHP Staff members, key contacts and an organizational chart including, without limitation: (a) the frequency of meetings with Company leading up to the applicable Event; and (b) the dates and times that each MHP Staff member will be on-site during the applicable Event and in the days leading up to and after the applicable Event. Company recognizes that this initial draft schedule is subject to change.

AEG 000070

EXHIBIT I-7

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

**EXHIBIT B**

**Company Services/Obligations**

- Provide overall event vision, experiential direction and DinoTeams
- Contracting: Company shall be the contracting party with all Third-Party Vendors.
    - Company will consider in good faith MHP's recommendation to include in contracts with Third Party Vendors payment terms of fifty percent (50%) deposit upon contract execution and fifty percent (50%) within **thirty (30) days** of the conclusion of the Event and receipt of final invoice, provided that contracts between Company and Third-Party Vendors are solely within Company's control and nothing in this Agreement will be construed as making MHP a beneficiary of such contracts.
    - All "contracted staff" will be hired by Company, using a 3rd party payroll service such as CAPS Payroll Service and will be paid in accordance with federal and state requirements, provided that if Company requests that MHP coordinate Third Party Payroll Review and Management (including setting up the employees with payroll information, coordinating payroll information process, payment reporting), then MHP shall do so through CAPS Payroll Services under an account established by Company.
    - In the event that MHP contracts and pays directly an approved third party or provides and pays for approved third party staff, Company shall advance one hundred percent (100%) of the commitment to MHP prior to any funds being released by MHP pursuant to such agreement, including all taxes, travel and fees. Notwithstanding the foregoing, MHP shall not contract and/or pay directly any third party and/or provide and/or pay for third party staff without Company's express written approval, which may be withheld in Company's sole discretion.
- Company shall lead and direct Event marketing
    - MHP shall support Company marketing, community programs, and public relations as directed by Company; all decisions to be made by Company in its sole discretion.
    - In coordination with Company, MHP shall oversee and manage a third-party vendor hired to coordinate community public relations (including, without limitation, exploring community opportunities, fundraisers and outreach), with such vendor and associated costs to be considered a show/Event cost.
- Manage and execute talent booking services
- Manage and hiring Artist Relations / Advancing Team

**MHP Services/Obligations**

- *Services*
    - 2020-2022 Events: MHP to oversee event production by leveraging its festival-related systems and third-party vendors including, without limitation, revenue management, 3rd party staffing, hospitality, site operations, production, catering, security/fire/ems, traffic and parking, venue relations, lodging coordination, VIP and patron experience as more fully described below.
        - For clarity, MHP will not handle stage production but in collaboration with Company will hire a third-party vendor to provide this service.
        - Prior to January 31 of each year of the Event, the Parties shall mutually agree upon an organization chart setting forth individual responsibilities and integration of teams.
    - 2020 Event: MHP shall manage food concessions at the 2020 Event, which shall include recruitment and contracting of third-party food vendors and staff, site layout, cash management and settlement and post-Event auditing. All agreed-upon billbacks (including, without limitation, ice, tents and power) will be charged back to each third-party food vendor at the 2020 Event. If Company exercises the option described in Section 3(b) of the Agreement, MHP shall manage food concessions at the 2021 Event and 2022 Event on the same terms and conditions as are applicable to the 2020 Event. All third-party vendors are subject to Company's approval, not to be unreasonably withheld, and all contracts with third party vendors will be entered into by MHP. Food Operations will include vending hours throughout the Event and any other days permitted by the Department of Health. Notwithstanding the foregoing, all food vendors subject to Company's final approval.

Where applicable, each position listed below shall assess, develop, plan and manage on site execution of plan for each corresponding bulleted item.

AEG 000071

EXHIBIT I-8

DocuSign Envelope ID: E71FD353-9579-4B65-B242-4A036D1FAAAD

| MHP Staff | MHP Services |
|---|---|
| MHP Executive Team – Michael Sampliner | - Site Operations and site planning services;<br>- Main point of contact for Lost Lands principals Jeff Abel & Brett Abel and their designee(s)<br>- Direct & Manage MHP Operations Team<br>- Liaison between Lost Lands departments, festival production, third-party stage production, site operations, merchandise, sponsorship, 3rd party concessions for the overall festival site build and coordinated activations<br>- Advise on the hire of a festival security director, production manager, and medical provider<br>- Make recommendations for consideration on festival security deployment in consultation with festival security director and Lost Lands principals<br>- Oversee the implementation of central command unit to be provided by third party (example: Unified Command)<br>- Will coordinate with security director and festival principals in the development of emergency operating plans coordinating with security, medical, fire, dispatch and local law enforcement<br>- Will coordinate with security director and festival principals in the development and execution of ingress and egress plans, including all traffic, tolls, campground striping and parking staff. This includes plans for all patrons and staff across all entrances and exits in the festival and campgrounds as well as any off-site locations.<br>- Work coordinate with Security Director on security staffing plan (local and non-local 3rd party vendors)<br>- Work with Security Director and Company to provide auditing services to assess cost and verify attendance of security teams.<br>- Advise on vendor Marshalling Yard protocol in conjunction with Security Director<br>- Advise on Prohibited Items list in conjunction with Company and Security Director<br>- Coordinate / schedule / direct all meetings / communications with list of all topics for discussion during the meeting. Meetings will be weekly starting at the beginning of the calendar year of the event. Meetings will be scheduled in advance. When possible, dedicated timeslots for each department so every team member is not required for the duration of every call. Follow up with action items determined during meetings.<br>- Advise on, in coordination with the Security Director and Company, the development of all festival and venue safety plans including, without limitation, fire plan, medical plan, flood plan, extreme weather plans, active shooter plan.<br>- Manage and oversee craft vendors and/or delegate the same. Company agrees that a craft vendor management position will be hired, reporting to MHP, as a festival expense. Notwithstanding the foregoing, all craft vendors subject to Company's final approval. |
| Senior Site Operations Director | - Source and negotiate all vendor proposals and present final bids for approval to Lost Lands Principals.<br>- On event site will manage overall build schedule and campgrounds<br>- Responsible categories for both sourcing & onsite management include: Catering, Fencing, Barricade & Bike Rack, Golf Carts, Heavy Equipment, Fuel, Generators, Porto Johns & Comfort Stations, Showers, work trailers, office trailers, Safety Lighting, Light Towers, Tents, IT, COWs, Radios, Local Rentals (Tables, Chairs, etc.), Toll Booth Management Team, Parking Team, Camping Team, Line Striping, Signage Plan<br>- Hiring and management of tent-only area and placement. |

AEG 000072

EXHIBIT I-9

DocuSign Envelope ID: E71FD363-9579-4B85-B242-4A036D1FAAAD

|  |  |
|---|---|
|  | <ul><li>Assess, develop plan and manage on site execution of plan for road repair, dust control, site lighting (safety focus), grounds leveling, brush clearing, tree maintenance</li><li>Assess, develop plan and manage on site execution of plan for water transport, wells and overall distribution</li><li>Assess, develop plan and manage on site execution of plan for Campground Patron Comforts (Ice, Water, Showers, Porto Johns, Lighting, etc.)</li><li>Hire and manage site ops team</li><li>Assess, develop plan and manage on site execution of plan for safety markers throughout campgrounds and event site</li><li>Assess, develop plan and manage on site execution of plan for employee and attendee crossing of route 13.</li><li>Assist in the planning and execution of contingency plans related to all weather/emergencies.</li><li>Will review and comment on fan facing maps in a timely and efficient manner.</li></ul> |
| Site Operations Lead | <ul><li>Overall venue management (within Festival Gates)</li><li>Additional Responsible categories include:<ul><li>Traffic plans, Manage Traffic Engineer, Oversee Ingress/Egress Plans, Coordinate with Local Law Enforcement, Coordination with Towing Vendor</li><li>Waste & Recycling plans</li><li>ADA Vendor Management</li><li>Local Labor and Work Exchange Teams (if applicable)</li><li>Source & Manage Local Labor Coordinator (if applicable)</li><li>Rentals Onsite Deployment (Tables, Chairs, etc.)</li></ul></li><li>Coordinate Shuttle plan w/ Bus.Com and onsite Shuttle Routes including pick-up and drop-off</li><li>Coordinate Uber / Taxi Drop off Lot</li><li>Coordinate Toll Setup (including staffing levels and security check-points)</li><li>Coordinate Locksmith and Towing Plan for Campgrounds</li><li>Develop Egress Vehicle Plan from Campgrounds</li><li>Develop and Oversee Boneyard creation and execution</li><li>In coordination with MHP Executive Team and Senior Site Operations Director, hire and manage site ops team</li><li>Assist in the planning and execution of contingency plans related to all weather/emergencies.</li></ul> |
| Festival Operations Analyst | <ul><li>In coordination with MHP Executive Team, Senior Site Operations Manager and Company, manage Site Layout, Mapping, Signage, including without limitation, laying out maps, CAD drawings, planning signage content, design, artwork, layout and placement, printing oversight and supervision of signage company.</li><li>Site Data / Asset Requests and Approvals by Vendor</li><li>Deploy Vendor Advance Data to the Appropriate Site Departments</li><li>Coordination of Vendors with Advance Information Data and Build Data</li><li>Build Schedule</li><li>Build Data / Daily Monitoring</li><li>Oversee CAD creation with 3rd party vendor, and communicate changes to all departments including Company and MHP Management Team</li><li>Create radio channel grid / guide</li></ul> |

10 of 15

AEG 000073

EXHIBIT I-10

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

| | |
|---|---|
| | <ul><li>Create / manage new communication plan for staff outside of email (app / website)</li><li>Advise on order quantities for products such as camo netting in order to cover every tent, trailer, container, building and vendor.</li></ul> |
| Site Operations Coordinator | <ul><li>Assist Festival Operations Analyst with Data Templates and Related Organizational Structure</li><li>Vendor Advance</li><li>Daily Build Data Monitoring</li><li>Communication of Advance Needs Between Departments</li><li>Alert, implement and follow up to completion advancing information to Company and Vendors through use of Marcato or similar database software.</li><li>Assist in determining the correct number of wristbands to order for each department and for each wristband type, work directly with Box Office Manager to make sure everyone on site has the appropriate wristbands.</li><li>Assignment and distribution of wristbands by pre-determined deadline</li></ul> |
| Festival Operations Manager | <ul><li>Working with MHP Executive Team, Senior Site Operations Director, manage and execute overall site operations plan, including staff and vendor management, 3rd party payroll management, and cross department communication</li><li>Hiring and management of Glamping tent company, Glamping placement, Glamping activities</li><li>Water and Ice for production / back of house operations / staff</li><li>Lost & Found</li><li>Security Deployment Grids</li><li>Runners & Site Vehicles</li></ul> |
| Festival Lodging Coordinator - | <ul><li>Assess, develop plan, manage and execution both onsite and off-site execution of all plans related to where staff will sleep including hotels, RVs, trailers, AirBNB. Staff to include Company and its employees, vendors hired by Company, MHP, MHP employees and vendors hired by MHP</li><li>Manage/ coordinate / advance all staff lodging<ul><li>Reduce dependence of onsite RV's</li><li>Source local hotels and VRBO's</li><li>Manage overall lodging grid and placement</li><li>Find efficiency of onsite vs offsite as well as bulk housing vs single rooms for cost-effective housing strategy.</li></ul></li><li>Coordinate w/ Company to set up hotel blocks before public announcement of date of event.</li><li>Staff camping amenities - comfort stations, restrooms / showers</li><li>Manage / hire on site housing director for placement of people in trailers, bedding and towel distribution including laundry sourcing.</li><li>Manage / hire "handyman" for Staff RV world(s) for servicing RVs as needed</li><li>Provide quotes / options for AirBnB / VRBO for long term staff, book same as approved by Company</li><li>Work with MHP Executive Team and Company to create agreed upon housing rules and track and bill back damages when applicable</li></ul> |

AEG 000074

EXHIBIT I-11

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

| | |
|---|---|
| Marketing / Sponsorship / Ticketing | - Review Company marketing plan and digital spend and work with team where needed on best practices and targeting<br>- Provide bi-weekly metrics and reporting (along with any education needed) and provide ideas and suggestions where applicable for Company Marketing team to Implement if they chose<br>- Work with Company and MHP Executive Team to review and create new ticket types, collaborate on all ticket prices and ticketing tiers, review and onboard secondary market program, communicate and liaison between ticketing teams and Company marketing team.<br>- Maintain administrative duties for sponsorship program<br>- Assist in implementing and maintaining pipeline tracking system<br>- Assist in implementing sponsor deliverables<br>- Coordinate marketing deal points with sponsors and deliver direction to Company marketing team to implement<br>- Part of onsite sponsorship activation team, assisting with load-in and out of all sponsors.<br>  - *For clarity, a Sponsorship activation lead will still be required as a 3rd Party Payroll or vendor to run point on activation and logistics as a festival expense.* |
| Administrative Assistant - | - Assist MHP Executive Team with administrative functions such as digital filing, contracting, payment processing, 3rd party payroll functions (if necessary), and all other administrative duties as assigned. |
| Festival Artist Advance & Communication | - Management the communications flow between departments on Artist Contracts, Finance, Industry Relations, Artist Hospitality, Artist Relations |
| MHP Executive Team – Jeremy Stein, Chad Cheek, Darcy Johnson | - Revenue<br>  - Ancillary Revenue Review Opportunities and Processes for:<br>    - 3rd Party Concessionaire<br>    - Merchandise<br>    - Craft Vending Management<br>    - Secondary Market Ticketing<br>    - Source ATM vendor / placement<br>    - Other Ancillaries<br>  - Sponsorship Activation<br>    - Implement pipeline tracking system<br>    - Approve all deal points with Company<br>    - Coordinate marketing deal points and deliverables with Company<br>  - VIP Plan Review<br>- Business Operations<br>  - Build full budget with estimated expenses based on actual expenses from previous years |

12 of 15

AEG 000075

**EXHIBIT I-12**

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

- Provide an updated projection on a monthly cycle that will including a breakdown of committed vs projected expenses as well as projected revenue including ticket sales data.
- Third Party Payroll Review and Management, including setting up the employees with payroll information, coordinating payroll information process, payment reporting
- PEX Implementation (replacement for petty cash)
- Cancellation Insurance (assist in policy sourcing, provide input on coverage, subject to Company's insurance broker's advice)
- Audit Review and Analysis of Key Revenue Areas
- Manage Onsite Cash Room Operations
    - Build upon 2019 program (w/ TVC)
- Manage Onsite Audit Operations
    - Oversee audit programs (similar to EF) for Security, Beverage Operations, Merchandise, General Store and Shower operations.
    - Note that the Food Program is dual control with TVC running the settlement thus a separation between operations and accounting is already built in.
- Projections & Settlement
    - Deliver real-time working projections with an official reforecast once a month
    - Deliver a pre-settlement within 14 days post event
    - Deliver a final settlement within 45 days postevent
- Ticketing
    - Build suggested ticket types for all tickets sold including admissions, camping, and ancillary tickets (i.e. create new ticket types that will excite fans and bring in more revenue than the cost of managing the new ticket type)
    - Build suggested ticket prices and tiers for all tickets sold including admissions, camping, and ancillary tickets.
    - Work with Company to maximize price points and streamline overall ticketing options to maximize revenue
    - Add a secondary market program (such as Lyte) for enhanced revenue
    - Sync up all ticketing historical and rename foundation to maximize reporting
    - Work with Client to streamline wristbands and pass program.
- Data & Analytics
    - Data Tracking and Reporting (similar to Electric Forest)
        - Catering Tracking
        - Fuel Tracking
        - Build Schedule and Optimal coordination for efficiency between departments
    - Ticketing & Revenue
        - Advance data capture and analysis including week over week zip code market reporting, ticket sales trend
- Other
    - Source Décor and/(or) manage Décor Installation Team including Front of House, Back of House, VIP -
    - Advise, Source Fabricators

AEG 000076

EXHIBIT I-13

DocuSign Envelope ID: E71FD353-9579-4B65-B242-4A036D1FAAAD

| | |
|---|---|
| Contracting | • MHP to turn-key all event contracting with the understanding that, if Company approves the contract, Company will approve and sign all agreements related to the Events.<br>　　• *Company is free at any time to perform its own Event contracting directly (provided it notifies MHP for tracking purposes).*<br>　　• *For clarity, no Event-related contracts shall be executed without the signature of an authorized Company representative, there shall be no non-contractual commitments (e.g., lodging, marketing, etc.) made without prior approval in writing from an authorized Company representative and no payments shall be issued without an approved stamp in MHP Accounts Payable Approval System by Jeff Abel or Brett Abel (one must be designated for this purpose). Company will be in control of final commitment as well as all payments issued. MHP may inform third parties that all agreements are subject to Company's approval and that Company is the party responsible for payment and other contractual obligations.*<br>• MHP to build and manage the Digital Show File<br>　　• All paper will be scanned, named, captured in a digital show file broken down by focus areas including but not limited to Artist, Ticketing, Revenue, Production, Site Operations, Vendors, Vendors (Non-Contract), Venue, Land Leases, etc.<br>　　• Captured information will include quotes, contracts, approved needs, W9, COI and any other information relevant to the Event. For the avoidance of doubt, MHP will assist in the collection of COIs for artists and third party vendors. |
| Accounting | • MHP to setup a separate show code account in its accounting system for the Event and maintain a show level P&L<br>• MHP to deliver monthly reporting and forecasting to Company outlining current position<br>• MHP to maintain real-time event projection and turn-key the contractual commitment and settlement process<br>• MHP to setup *Jeff Abel* or *Brett Abel* as an approver in MHP's Accounts Payable Approval System at $1 level.<br>• MHP FTE Staff positions (defined in Exhibit A) plus Jason Miller and Kayleigh Neu are included in MHP Fee. All other expenses, including staff expenses, are considered Event-related expense<br>• All travel and lodging shall be considered an Event-related expense<br>• Company to advance ticketing funds as required to MHP to cover Event-related cash flow. All contracts must be signed by Company management OR agreed upon in writing prior to a non-contractual commitment. All payments made must be approved by Company management at $1 level in MHP' Accounts Payable Approval System.<br>• In the event of an Event shortfall, MHP reserves the right to recoup shortfall in the following year's Event<br>• MHP to advance all contractual event funding on behalf of Company as long as sufficient funds are in MHP account to do so.<br>　　○ *At all times, Company remains responsible for Event-related financial commitments and Company is free at any time to pay its Event-related financial commitments directly (provided it notifies MHP for tracking purposes).* |

**Approvals Process**

- MHP agrees that it shall present proposals, bids and submissions (collectively, "Proposals") from third parties in connection with the services that those third parties seek to provide at the Event. Company agrees to review the Proposals and use its reasonable discretion to approve or deny such Proposals, which shall be deemed not to be approved if Company has not responded to MHP's request within the time periods set forth below.
    - *More than thirty (30) days prior to the applicable Event*: Company shall review and provide feedback on any Proposal sent to it by MHP five (5) days of its receipt.
    - *Between thirty (30) days prior to the applicable Event and the commencement of the applicable Event*: Company shall review and provide feedback on any Proposal sent to it by MHP within forty-eight (48) hours of its receipt.
    - *During the applicable Event*: Company shall provide feedback on any Proposal sent to it by MHP within two (2) hours of its receipt.
    - In each scenario referenced above, MHP Agrees to attempt to reach Jeff Abel and/or Brett Abel on all lines of communication available, e.g. radio, phone call, text, email.

AEG 000077

EXHIBIT I-14

DocuSign Envelope ID: E71FD353-9579-4B85-B242-4A036D1FAAAD

EXHIBIT C

Emazing
515 Alive
Elevated Lyfe
Aurora Vision
HTC and/or its affiliates

AEG 000078

EXHIBIT I-15